

# THE ATTORNEY GENERAL
## OF TEXAS

AUSTIN 11, TEXAS

GERALD C. MANN
XXXXXXXXXXXXXXXX
ATTORNEY GENERAL

Mr. T. E. Allday
Auditor of Oil & Gas Royalties
The University of Texas
Austin, Texas

Opinion No. O-730

Re: Interpretation and
Constitutionality
of Section 4, Chapter
6, Acts of 1921, and
Section 14 of Chapter
1, Acts of 1925, as
amended by Chapter
143, Acts of 1925,
said Acts dealing with
the payment of rentals
and royalties on oil
and gas leases upon
land appropriated to
the University of
Texas.

Dear Mr. Allday:

This opinion is given in reply to the written request contained in your letter of April 29, 1939, and the additional request contained in your letter of June 15, 1939. In your letter of April 29, 1939, you propound the following questions:

1. "Was it the intention of the Legislature, when it passed Cahpter 6 of the Acts of 1921, to repeal or nullify either or both of the $2 an acre considerations due to be paid by the permittees under subdivisions 1 and 2 of Section 7 of Chapter 83 of the Acts of 1917, for, and on, the leases that were executed as a result of permits having been issued on the University lands?"

2. "Is it your opinion that either Section 14 of Chapter 71, or Section 14 as amended in Chapter 143 (both Chapters being Acts of 1925), had the effect of repealing or nullifying the same considerations shown in question 1, due to be paid by the permittees under the same subdivision, section, and chapter mentioned in the preceding paragraph, for, and on, the leases that were executed resulting

from permits issued on the University
lands?"

In your letter of June 15, 1939, you propound
the following additional question:

3. "In the event you hold that it was
the intention of the Legislature to repeal
the $2 considerations, which considerations
are mentioned in Subdivisions 1 and 2, of
Section 7 of Chapter 83 of the Acts of 1917,
with Chapter 6 of the Acts of 1921, or with
Chapter 71 of the Acts of 1925, or with both
of these Acts, would such Act or Acts, in
your opinion, be unconstitutional?"

In your letter you divide the leases of University
lands to which your inquiries are directed into two groups,
the first group comprising leases issued under and by
virtue of the provisions of Chapter 83 of the Acts of 1917
and Chapter 6, Section 4, Acts of 1921; the second group
comprising leases that were issued under Chapter 83 of the
Acts of 1917 and Chapter 71 of the Acts of 1925 (Section 14)
as amended by Chapter 143, Acts of 1925.

You state that the Commissioner of the General
Land Office has construed Section 4 of Chapter 6 of the
Acts of 1921 as repealing and abolishing the requirements
contained in Chapter 83, Section 7, of the Acts of 1917,
for the payment of $2.00 per acre at the time the lease
is issued and $2.00 per acre annually thereafter during
the life of the lease with respect to leases falling in
the first group described in your letter. You further
state that the Commissioner has construed Section 14 of Chap-
ter 71 of the Acts of 1925, as amended by Chapter 143, of the
Acts of 1921, so as to repeal and abolish the requirements
of Chapter 83 with respect to the $2.00 per acre case pay-
ment and the $2.00 per acre annual payment on leases falling
in the second group described in your letter.

A consdieration of the questions you have asked
necessarily requires a careful review of the relevant statutes.

On March 16, 1917, Chapter 83 of the Acts of 1917
was approved. Such Act was a comprehensive amendment to the
1913 Act, and provided that all University, public school
and other lands designated in the Act, should be open to the
prospecting for and developing of minerals, including petro-
leum and natural gas "upon the terms and conditions provided
in this Act."

Section 2 of Chapter 83 provided that any person "desiring to obtain the right to prospect for and develop the minerals. . .that may be in any of the areas included herein may do so under the provisions of this Act, together with such rules and regulations as may be adopted by the Commissioner of the General Land Office relative thereto. . ."

Section 3 provided for the filing with the County Clerk of applications to obtain the right to prospect for and develop petroleum and natural gas in surveyed areas covered by the Act.

Section 4 provided for the filing with the County Surveyor of applications to obtain the right to prospect for and develop petroleum and natural gas in any of the unsurveyed areas included in the Act.

Section 5 prescribed the duty of the Commissioner of the General Land Office upon receipt by him of an application after same had been filed with the County Clerk or the Surveyor, and such section also provided that such application should be accompanied by field notes and plat, $1.00 filing fee and 10 cents per acre for each acre applied for, also a sworn statement by the applicant showing certain facts. Section 5 then provides as follows:

"And if upon examination the application or the application and field notes are found correct and the area applied for is within the provisions of this Act the Commission shall issue to the applicant or his assignee a permit conferring upon him an exclusive right to prospect for and develop petroleum and natural gas within the designated area for a term not to exceed two years."

Section 6 prescribed the time in which the owner of a permit should begin in good faith the actual work necessary to the physical development of said area; provided for the filing of an affidavit stating that such work had been begun and the extent of such work and the expenditures incurred therein and a statement of whether or not petroleum or natural gas had been discovered in commercial quantities. The final sentence of Section 6 reads as follows:

"The owner of a permit shall not take, carry away or sell any petroleum or natural gas before obtaining a lease therefor; provided, such quantity as may be necessary for the continued development

of the area before obtaining a lease may be used without accounting therefor."

Section 7 of Chapter 83 provides as follows:

"If at any time within the life of a permit one should develop petroleum or natural gas in commercial quantities the owner or manager shall file in the General Land Office a statement of such development within thirty days thereafter, and thereupon the owner of the permit shall have the right to lease the area included in the permit upon the following conditions:

'1. An application and a first payment of two dollars per acre for a lease of the area included in the permit shall be made to the Commissioner of the General Land Office within thirty days after the discovery of petroleum or natural gas in commercial quantities.

'2. Upon the payment of two dollars per acre for each acre in the permit a lease shall be issued for a term of ten years or less, as may be desired by the applicant, and with the option of a renewal or renewals for an equal or shorter period, and annually after the expiration of the first year after the date of the lease the sum of two dollars per acre shall be paid during the life of the lease, and in addition thereto the owner of the lease shall pay a sum of money equal to a royalty of one-eighth of the value of the gross production of petroleum. The owner of a gas well shall pay a royalty of one-tenth of the value of the meter output of all gas disposed of off the premises.

'3. The royalties shall be paid to the State through the Commissioner of the General Land Office at Austin, monthly during the life of the lease. All payments shall be accompanied by the sworn statement of the owner or manger or other authorized agent showing the amount produced since the last report and the market value of the output and a copy of all pipe line receipts, tank receipts, guage of all tanks into which petroleum may have been run, or other checks and memoranda of amount put out or into

pipe lines or tanks or pools. The books and accounts, the receipts and discharges of all pipe lines, tanks and pools and gas lines and gas pipes and all other matters pertaining to the production, transportation and marketing of the output shall be open to the examination and inspection at all times by the Commissioner of the General Land Office or his representative or any other person authorized by the Governor or Attorney General to represent the State. The value of any unpaid royalty and any sum due the State under this Act upon any lease shall become as prior lien upon all production produced upon the leases areas and the improvements situated thereon to secure the payment of any royalty and any sum due the State arising under the operation of any portion of this Act

4. The permit or lease shall contain the terms upon which it is issued including the authority of the Commissioner to require the drilling of wells necessary to offset wells drilled upon adjacent private land, and such other matters as the Commissioner may deem important to the rights of the applicant or the State."

Section 16 of Chapter 83, in part, provides as follows:

"The payment per acre required to be made before the issuance of a permit shall be paid annually thereafter during the life of the permit or lease. A separate written application shall be made for the area desired in a permit. No permit, lease or patent shall embrace the area in two or more applications. No applications, permit, lease or patent shall embrace a divided area. Whole tracts of surveyed land may be applied for as a whole or in eighty acre tracts or multiples thereof without furnishing field notes therefor. A duplicate of every permit and lease shall be kept in the General Land Office. The area in each permit shall be developed independently of other areas."

Chapter 83 of the Acts of 1917, with the amendments

hereinafter noted, continued in force as the basic law
governing the issuance of permits and leases for oil and
gas in University lands until the effective date of Chapter
71 of the Acts of 1925, approved March 10, 1925. Prior to
the enactment of Chapter 71 of the Acts of 1925, several
amendments were made to Chapter 83, but, in our opinion,
only one of such amendements is material to this opinion.
Such amendment is Chapter 6, of the Acts of 1921, approved
February 3, 1921.

By the express terms of Section 1 of Chapter 6 of
the Acts of 1921, such amendment purported to apply only to:

"Permits to prospect for oil and gas here-
tofore issued on University land, and Public
School land which is unsold at the time this
Act goes into effect, river beds, or channels
and fresh water lakes and islands therein, and
which have not expired. . ."

And also to:

"All permits to prospect for oil and gas
heretofore issued on said lands and areas and
all permits heretofore issued after the Mineral
Act of 1917 went into effect. . .which have
expired at the time this Act goes into effect,
but on which the drilling of a well or wells
has been begun in good faith, or with refer-
ence to which permits and the right of the
owner of the same to the possession of the
area included therein bona fide litigation
has existed during the whole or a part of
the term of the permit. . ."

Section 1 of Chapter 6 provided that all of such
permits as described above should be extended "so that they
shall remain in full force and effect for a period of five
years from the date of the issuance of the permit, condi-
tioned only upon the performance of the terms of this Act."

Section 4 of Chapter 6 provided that:

"If oil or gas should be produced in pay-
ing quantities upon the area included in any
of the permits included in this Act, the owner
of the permit shall report the development to
the Commissioner of the General Land Office
within thirty days thereafter, and apply for a

lease, accompanying the application with a
correct log of the well or wells, and thereupon
a lease shall be issued without the payment of
any additional sum of money and for a period
not to exceed ten years, subject to renewal or
renewals."

The question is thus presented as to whether Section
4 of Chapter 6, properly construed, repealed and abolished
the requirements specified in Section 7 of Chapter 83,
Acts of 1917, that a permittee, before being entitled to a
lease, should pay to the State $2.00 per acre for each acre
included within his lease. and that in addition $2.00 per
acre should be paid thereafter annually during the life
of the lease. Clearly, Section 4 of Chapter 6 was not
intended to affect in any manner permits issued subsequent
to the effective date of Chapter 6, because its operation
is expressly limited in Section 1 thereto to "permits here-
tofore issued". If Section 4 of Chapter 6 is construed so
as to repeal and abolish the requirements of the $2.00 per
acre cash payment and the $2.00 per acre annual payment
required by Chapter 83, or either of such payments, such
construction and effect must, necessarily, be limited so
as to apply only to leases resulting from permits issued
prior to the effective date of Chapter 6. Permits issued
subsequent to said date would be wholly unaffected by the
Act under any construction thereof. We postpone any fur-
ther discussion as to the proper construction to be given
to Chapter 6 to a subsequent place in this opinion.

No other amendments with which we are now concerned
were made to Chapter 83 of the Acts of 1917 until the
enactment of Chapter 71, Acts of 1925, approved March 10,
1925. Chapter 71, Acts of 1925, was a comprehensive Act
dealing with the sale of oil and gas leases on unsold Univer-
sity land and upon University land which had been sold with
mineral reservation prior to the effective date of Chapter
71. The operation of Chapter 71 was expressly limited by
the final clause of Section 1 of the Act which reads as follows:

"Provided, oil and gas permits and leases
outstanding shall not be affected by this Act
except as provided in Section 14 thereof."

Section 14 of Chapter 71 provides:

"All oil and gas permits heretofore is-
sued upon lands included herein and now in
force shall be extended for a term of five
years from date thereof and whenever production

is secured in paying quantities and the pay-
ment of royalty begins, the owner shall not
pay any further annual money rental. After
production is secured in paying quantities
the owner shall be entitled to a lease which
shall run so long as the area covered by his
lease produces oil or gas in paying quan-
tities, subject to the provisions of this Act."

Chapter 143, Acts of 1925, approved March 30, 1925,
by the same Legislature which enacted Chapter 71, amended
Section 14 of Chapter 71, so that Section 14 shall there-
after read as follows:

"All oil and gas permits heretofore and
hereafter issued upon lands included herein
and which have not expired shall be extended
for a term of five years from date thereof
conditioned only upon the payment of the annual
rental, as provided by law, in advance
and whenever production is secured in paying
quantities and the payment of royalty begins,
the owner shall not pay any further annual
rental money. After production is secured in
paying quantities, the owner shall be entitled
to a lease which shall run so long as the area
covered by his lease produces oil or gas in
paying quantities subject to the provisions
of this Act."

On the same day, March 30, 1925, Chapter 140, Acts
of 1925, was approved by the Legislature. Chapter 140 reads
as follows:

"Sec. 1. That subdivision 2 of Section
7 of Chapter 83 of the Acts of the Regular
Session of the Thirty-fifth Legislature ap-
proved March 16, 1917, be amended so as to
hereafter read as follows:

"Upon the payment of $2.00 (two dollars)
per acre for each acre in the permit a lease
shall be issued for a term of ten (10) years,
or less, as may be desired by the applicant,
and with the option of a renewal or renewals
for an equal or shorter period, and immediately
after the expiration of the first year after
the date of the lease the sum of two ($2.00)
dollars per acre shall be paid during the life

of the lease, and in addition thereto the owner of the lease shall pay a sum of money equal to a royalty of one-eighth of the value of the gross production of petroleum. The owner of a gas well shall pay a royalty of one-tenth of the value of the metre output of all gas disposed of off the premises; provided, however, that the provisions hereof as to the payment of two ($2.00) dollars per acre during the lease period and the life of said lease shall not apply to leases of bays, marshes, reefs, salt-water lakes or other submerged lands containing as much as one hundred (100) acres but not in excess of five hundred (500) acres upon which as many as five wells have been drilled, and upon which an expenditure of as much as one hundred thousand ($100,000.00) dollars has been made. The drilling of said wells and the expenditure of said amount to be established to the satisfaction of the Commissioner of the Land Office.

"Sec. 2. The fact that leases exist upon some of the bays, marshes, reefs, salt-water lakes and other submerged lands of the area herein indicated upon which many wells have been drilled and large amounts of money expended, and the fact that another periodical payment of two ($2.00) dollars per acre will soon be due and the fact that the payment of said amount is unfair and unjust to the owners of these leases, create an emergency and an imperative public necessity, that the constitutional rule which requires bills to be read on three consecutive days be suspended and same is hereby suspended; and this Act take effect from and after its passage and it is so enacted."

Chapter 140, Acts of 1925, (copied above) appears as Article 5344 of the 1925 Revised Civil Statutes of Texas.

By virtue of the enactment of Section 14 of Chapter 71, Acts of 1925, as amended by Chapter 143, Acts of 1925, the question is presented as to whether such Act, properly construed, has the effect of repealing and abolishing, as to permits and leases previously issued, the requirements of Section 7, Chapter 83, of a $2.00 per acre cash payment at the time the lease is issued and a $2.00 per

acre annual payment thereafter during the life of the lease.

If it were necessary in this opinion to make a construction of Chapter 6, Section 4, Acts of 1921, and Section 14 of Chapter 71, Acts of 1925, we would feel no hesitancy, in the light of the legislative history preceding and following the Acts in question, in holding that such Acts, properly construed, do not purport or intend to release permittees and lessees from making the $2.00 per acre cash payment and also the $2.00 per acre annual payment during the life of the lease, as required by Chapter 83.

However, in view of your alternative question as to the constitutionality of Section 4 of Chapter 6, and Section 14 of Chapter 71, it is not necessary that we at this time make an independent construction of such Act. For the purpose only of testing the constitutionality of such Act, we assume that the construction which has been given to said Act by former Commissioners of the General Land Office is the proper construction. You state in your letter that former Commissioners of the General Land Office have construed Section 4 of Chapter 6 of the Acts of 1921, as repealing and abolishing the requirements of Chapter 83, Acts of 1917, with respect to the requirement of a $2.00 per acre cash payment at the time the lease is issued and a $2.00 per acre annual payment thereafter during the life of the lease as to leases falling within group one above described. You further state that former Land Commissioners have construed Section 14 of Chapter 71, Acts of 1925, as amended by Chapter 143, Acts of 1925, as repealing and abolishing the provisions of Chapter 83, insofar as Chapter 83 requires the payment of the stated $2.00 per acre payments with respect to leases falling in group two above described. So construed, are the Acts referred to constitutional?

Section 12 of Article 7, of the Constitution of Texas, provides as follows:

"The land herein set apart to the University fund shall be sold under such regulations, at such times and on such terms as may be provided by law; and the Legislature shall provide for the prompt collection, at maturity, of all debts due on account of University lands, heretofore sold, or that may hereafter to sold, and shall in neither event have the power to grant relief to the purchasers."

Section 15 of Article 7 of the Constitution of Texas provides as follows:

"In addition to the lands heretofore granted to the University of Texas, there is hereby set apart, and appropriated, for the endowment maintenance, and support of said University and its branches, one million acres of the unappropriated public domain of the State, to be designated, and surveyed as may be provided by law; and said lands shall be sold under the same regulations, and the proceeds invested in the same manner, as is provided for the sale and investment of the permenent University Fund; and the Legislature shall not have power to grant any relief to the purchasers of said lands."

Section 53 of Article 3, of the Constitution, provides as follows:

"The Legislature shall have no power to grant, or to authorize any county or municipal authority to grant, any extra compensation, fee or allowance to a public officer, agent, servant or contractor, after service has been rendered, or a contract has been entered into, and performed in whole or in part. . ."

Section 55 of Article 3, of the Constitution, provides as follows:

"The Legislature shall have no power to release or extinguish, or to authorize the releasing or extinguishing, in whole or in part, the indebtedness, liability or obligation of any incorporation or individual, to this State, or to any county or other municipal corporation therein."

Section 51 of Article 3, of the Constitution, provides as follows:

"The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporations whatsoever. . ."

Indulging all presumptions, as we must, in favor of the constitutionality of the Acts in question, can it reasonably be concluded that said Acts do not violate any

of the constitutional provisions above quoted? Stated otherwise, the question to be determined is whether or not Section 4 of Chapter 6, Acts of 1921, or Section 14 of Chapter 71, Acts of 1925, construed as they have been construed by the former commissioners of the General Land Office, constitute a grant of relief to purchasers of University lands, or a grant of public money or extra compensation to the lessees of such land, or the release or extinguishment, in whole or in part, of an indebtedness, liability or obligation owed by such lessees to the State of Texas?

In order to decide the foregoing questions, it is necessary that we first consider and determine the nature and effect of the rights, estates and obligations which were created by the application for and the issuance of permits under Chapter 83, Acts of 1917. We believe the decisions of the Supreme Court of Texas in State v. Robison, 30 S. W. (2d) 292, and Theisen v. Robison, 8 S. W. (2d) 646, have clarified and settled such questions.

State v. Robison, supra, involved a construction of Chapter 71, Acts of 1925, with respect to the power of the Legislature to withdraw University lands from lease and under said Act after bids had been submitted to the Land Commissioner by persons desiring to purchase leases, in accordance with said Act. The court held that Chapter 71 was in effect an offer by the Legislature to sell oil and gas leases to the highest bidder in accordance with the provisions of such Act, and that after the person desiring to purchase such lease had complied with the provisons of the Act and had accepted such offer, by submitting a high bid, a contract with the State thereupon resulted, which contract was beyond the power of the Legislature to impair by subsequent legislation. The court in so holding used the following language:

"In the case of Jumbo Cattle Co. v. Bacon, 79 Tex. 5, 14 S. W. 840, 843, this court, speaking through Mr. Justice Gaines, says: 'When there is an offer made by an act of the Legislature which is accepted by an individual, there is a contract which is not within the power of the state to impair. After an acceptance, a repeal of the law cannot affect the contract; but, until an acceptance, a repeal of the act withdraws the offer, and no contract can be made.'"

"This correct announcement of the law applies

with full force to the case under considera-
tion in regard to the land included in schedule
B. An act of the Legislature made the offer,
and interveners have accepted it as provided
and conditioned in the Act. A contract between
the state and the highest bidder was made. White
v. Martin, 66 Tex. 340, 17 S. W. 727; Jumbo
Cattle Co. v. Bacon, 79 Tex. 5, 14 S. W. 840;
Standifer v. Wilson, 93 Tex. 232, 54 S. W. 898;
Tatum v. Kincannon, 54 Tex. Civ. App. 633, 119
S. W. 113. Nothing remained to be done to
effect the making of the contract. The act
specifically provides the means of producing
the evidence of the contract, i.e. it makes
it the mandatory duty of the commissioner to
examine the bid or bids, ascertain with whom
the state has contracted under its offer and
the acceptance thereof, and accordingly to
execute the lease. The doing of the minis-
terial acts of opening the bids, ascertaining
who is the highest bidder, and issuing the
lease according to the terms of the law, is
no part of the contract itself. It is only
making effectual the contract already made.
The acceptor of the state's offer can no more
withdraw his money deposit and back out than can
the commissioner refuse to carry out the con-
tract as the law requires of him. The con-
tracts here are not within the power of the
state to impair. The Repealing Act of 1929
(Acts 1929, c2) cannot affect these contracts,
but does withdraw the offer of further sales.

We believe the same statement can be made with
respect to the effect of Chapter 83, Acts of 1917; that
is, Chapter 83 was an offer by the State to persons de-
siring to prospect upon and to secure leases for oil and
gas on University lands, such offer being conditioned only
upon compliance with the terms and provisions of Chapter
83. Upon acceptance of such offer, by persons desiring to
secure permits or leases upon University lands, a contract
resulted which was beyond the power of the State to impair.

The question then arises: "Was it beyond the
power of the Legislature, after such contract was made, to
release, extinguish or forego a compliance by the permittee
or lessee with the obligations undertaken by the lessee
under the provisions of Section 7 of Chapter 83?" We
believe a determination of the nature of the contract so

entered into between the State and its permittees and lessees under Chapter 83 furnished the answer to this question. The decision in Theisen v. Robison, supra, clearly defines and establishes the nature of such contracts.

In Theisen v. Robison, 8 S. W. (2) 646, the Supreme Court of Texas construed Chapter 83 of the Acts of 1917 and also Chapter 71 of the Acts of 1925, exclusive of Section 14 of the latter Act. In that case the two acts were attacked as being unconstitutional on the grounds that they conferred on a permittee or lessee no greater right than a mere license, exercisable at the permittee's or lessee's option, to prospect for oil and gas, whereas the Constitution mandatorily requires the Legislature to dispose of University lands by sale only, and forbids the grant of a mere optional license. The Court after making an exhaustive review of the history preceding the Acts in question held that such acts authorized a sale of University lands. The Court said:

". . . under the thoroughly settled law of this state, the acts of 1917 and of 1925 operate not to grant mere licenses to explore for minerals, but instead they authorize conveyances by the state of minerals in place, and hence the Legislature in passing the acts obeyed the command of the constitution to sell the University lands.

"In order to arrive at a correct understanding of the rights of a permittee or lessee, under the first instrument issued under these acts, we must consider his rights under the succeeding instrument, since the right to the succeeding instrument, vests in him under the very first instrument as completely as the privilege of exploration, though, of course, subject to the conditions imposed by the statutes. The right to explore, to produce, and to appropriate relates back to, and is derived from, the initial permit or lease.

"Thus viewing the rights of the permittee or lessee, we find that each act authorizes the sale, at stipulated prices, of a permit in the one case and of a lease in the other, which invested the permittee or lessee and his assigns, on performance of stated obligations, with the exclusive right to explore certain lands for oil and gas, for a fixed term of years, and, upon the discovery of oil or gas in commercial or paying quantities, to produce and appropriate

same, so long as profitable production may continue. While the act of 1917 does not in terms provide that the right of production and of appropriation shall continue as long as oil or gas is produced in paying quantities,. as does the 1925 act, yet the provision of the, act of 1917 for successive lease renewals, at the option of the lessee or his assign, necessarily has the same effect as an express provision that the lease shall remain in force as long as oil or gas may be profitably produced."

After referring to and quoting from the opinion in Stephens Co. v. Mid-Kansas Oil & Gas Co., 254 S. W. 290, the court stated:

"In legal effect, the grants authorized by the acts are not essentially different from the grant in the ordinary oil and gas lease, such as was before the court in the Stephens County Case. The ordinary lease confers first an option to explore for oil or gas, but, after discovery of oil or gas in paying quantities, it confers the right to produce and appropriate the oil or gas. It is immaterial that the right to appropriate the oil or gas under the 1917 and 1925 acts follows and does not precede the final lease, because, as already pointed out, the permittee or lessee may compel the execution of the final lease on performing the obligations which the act imposes on him. Under the ordinary lease, the right to continue to produce and appropriate oil or gas is contingent on performance of similar obligations. It is unthinkable to treat the, ordinary lease as conveying minerals in place and to refuse to give that effect to the grants authorized by these acts."

The Supreme Court of the United States in Group No. 1 Oil Corporation v. Bass, 283 U. S. 279, 75 L. ed. 1032, has occasion to pass upon the nature of the interest created by the issuance of permits and leases under Chapter 83 of the 1917 Acts. The lessee in such case was claiming immunity from taxation with respect to income derived from the sale of oil and gas, produced under leases issued under Chapter 83. The claim of tax immunity was based upon the contention that the asserted tax was one upon an instrumentality of the State. The court held that under the provisions of Chapter 83, "a completely executed sale, without restrictions" occurred. The following language was used by

Mr. T. E. Allday, page 16 (O-730)


the court:

> "But no case has extended such immunity
> to property, real or personal, or income de-
> rived from its sale, where it has passed to the
> buyer by a completely executed act of..sale, with-
> out restriction, and no interest in it has been
> retained for the benefit of the Indians. Whatever
> may be the appropriate limits of the immunity, as
> applied in this class of cases, those limits are
> clearly exceeded by that asserted here."

In State v. Hatcher, 281 S. W. 192, and in Sawyer v. Robison, 268 S. W. 151, it was held by the Supreme Court of Texas that the transactions authorized by chapter 83 of the Acts of 1917, constituted a _sale_ of University land.

The above cited authorities, we believe, conclusively establish the following proposition:

> 1. That Chapter 83 of the Acts of 1917 con-
> stituted an offer by the state to persons desiring
> to purchase mineral rights in the University
> lands, and that a contract binding upon both
> the State and the premittee resulted when such
> persons complied with the provisions of Chapter
> 83 and secured a permit to prospect for oil
> and gas under the terms and conditions set forth
> in the Act.

> 2. That the issuance of a permit under
> Chapter 83, Acts of 1917, constituted sale by
> the State to such permittee of University land
> within the meaning of Sections 12 and 15, Arti-
> cle 7 of the Constitution of Texas.

> 3. The considerations and obligations pro-
> vided for in said contract and sale, agreed and
> undertaken by the permittee to be paid and per-
> formed, are prescribed definitely in Sections
> 6 and 7 of Chapter 83, Acts of 1917. One of the
> obligations as prescribed in Section 6, is that
> the permittee shall perform certain development
> work within a prescribed period. In Section 7,
> it is prescribed and required that an application
> for lease shall be made within 30 days after dis-
> covery of oil, accompanied by "a first payment
> of $2.00 per acre for a lease of the area included
> in the permit. . .", and that "annually after the

expiration of the first year after the date of the
lease, the sum of $2.00 per acre shall be paid
during the life of the lease, and that in addition
thereto the owner of the lease shall pay a sum of
money equal to a royalty of 1/8th of the value of
gross production of petroleum. The owner of a gas
well shall pay a royalty of 1/10th of the value
of the meter output of all gas disposed of off the
premises."

If subsequent acts of the Legislature are con-
strued to release and extinguish the obligation and liability
of permittees, whose permits were issued prior to the amen-
datory acts, to pay the $2.00 per acre cash price upon the
issuance of a lease and the $2.00 per acre annual payment
required during the life of the lease, or either of them,
do such acts violate any of the constitutional provisions
quoted above? We have concluded that such acts, when so
construed, do clearly violate such constitutional provi-
sions unless the State receives an adequate consideration
in return for the purported release of such obligation
and liability.

In our opinion, the plain effect of Section 4, of
Chapter 6, Acts of 1921, and of Section 14, Chapter 71, Acts
of 1925, when so construed, is to attempt to release and
discharge permittees from the obligation to make the $2.00
per acre cash and annual payments which such permittees
agreed and bound themselves to make at the time of their
applications for permit under Chapter 83, Acts of 1917. The
permittee's obligations as well as his rights were fixed and
secured upon the granting to him of a permit as prescribed
by Chapter 83. We hold that the Legislature, as held in
State v. Robison, supra, was prohibited from thereafter
impairing the permittee's rights and from increasing the
permittee's obligations to the State beyond the provisions
of Chapter 83, and this because of constitutional pro-
visions which prohibit the impairment of previously existing
contract rights. We as firmly believe, and we here hold, that
the Legislature, by reason of the constitutional provisions
hereinabove quoted, is likewise prohibited from releasing
or extinguishing any of the permittee's obligations or lia-
bilities as prescribed by Chapter 83, unless an adequate con-
sideration is received by the State in payment for such
discharge. We further hold that the Legislature is without
power to grant relief to such permittees or lessees.

We have searched in vain Chapter 6 and Chapter 71
for any provision or condition which can reasonably be deemed

a consideration required to be paid by the permittee in return for a release of the $2.00 payments in question. The plain result of such statutes, in our opinion, if construed as aforesaid, is to grant to the permittee the identical property, interests and rights which are provided for in Chapter 83 of the Acts of 1917, without requiring from him in return therefor any promise, payment or other consideration moving to the State. In support of this conclusion, we refer to the following cases: Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419; Judkins v. Robison, 109 Tex. p. 6, 160 S. W. 955; Greene v. Robison, 117 Tex. 515, 8 S. W. (2d) 655; Empire Gas & Fuel Co. v. State, 121 Tex. 138, 47 S. W. (2d) 265.

In Delta County v. Blackburn, 93 S. W. 419, the Supreme Court of Texas decided that an order entered by the Commissioners Court of Delta County attempting to reduce the rate of interest upon notes given in payment for the balance of the purchase price owing upon a sale of county school land from 7 per cent, as provided in the notes, to 3 per cent, violated Section 55 of Article 3 of the Constitution, in that such order was an attempt to release and extinguish the liability and obligation of the purchaser of such land. In so holding the court said:

"But while the Commissioners Court may be conceded, for present purposes, to possess such an authority as was there exercised, as incidental to its control as vendor over the title to the land, it does not follow that it has all of the power which an individual would have to change at will the rights arising out of a contract already made in selling. It cannot lawfully invest the proceeds of sales otherwise than as the law directs; nor can it release or extinguish liabilities or obligations which have accrued to the county or State further than may be essential to the proper exercise of the power of sale or disposition given to it."

With regard to the Commissioners Court's attempt to reduce the interest called for in the purchaser's notes, the Supreme Court said:

"They simply attempted to release him from his alternative obligation to pay the whole debt at one or to continue to pay interest at the rate of seven per cent, which, under the Constitution, they had not the power to do. It is idle to say that they exerted the power given them

to sell or dispose of the land. It had been sold
and neither party intended that the sale should
be disturbed. Such an extension of that power is
not at all essential to its full and free exercise,
but would make it impinge upon the other positive
constitutional provisions which restrict the autho-
rity of the counties in dealing with such subjects
and would open the door for many evasions thereof. . ."

"Differently viewed, as the commissioners
viewed it, their attempt, instead of setting at
naught the contract of sale, reasserting the
title of the county and reselling the land, was
to keep the sale in force, and, by releasing the
vendee from a part of his unquestionable obliga-
tion to the county, to induce him to perform the
remainder in a somewhat different way, which in-
fringed the other provision of the Constitution
forbidding the release or extinguishment of
liabilities and obligations to the county."

In Judkins v. Robison, 160 S. W. 955, the Supreme
Court had under consideration the constitutionality of the
repurchase Act of 1911, Article 5423, R. C. S. of 1911.
The court laid down the following rules for determining
the constitutionality of such an Act:

"The test to be applied to it, therefore,
is whether its necessary operation is to enable
the previous owner to reacquire the land at a
less price than he was obligated to pay under
his former purchase. If its terms were to that
effect or such were its necessary operation, we
think it should be held invalid, though it purported
to deal with the previous owner as a stranger
to the title, as such an act would but prove an
easy method to circumvent the constitutional
provision."

In Greene v. Robison, 8 S. W. (2d) 655, at page
658, the Supreme Court said:

"We cannot agree with respondents the land
commissioner and his attorney that the Legislature
has authority to relinquish to the owner of the
soil, without payment of consideration therefor,
minerals reserved to the state prior to the sale
of the land and withheld in his purchase thereof,
or that the cases of Cox v. Robison, 105 Tex. 426,

150 S. W. 1149, and Greene v. Robison, 109 Tex. 367, 210 S. W. 498, can be so construed."

In Empire Gas & Fuel Co. v. State, 47 S. W. (2d) 265, the Supreme Court was called upon to determine whether or not Chapter 23 of the Acts of 1931 was constitutional. Said act attempted to relieve the purchaser of school land sold with mineral reservation from the payment of any amount over and above a 1/16 royalty and 10 cents per acre rental, notwithstanding the fact that the Supreme Court in the case of Greene v. Robison, 8 S. W. (2d) 655, held that Chapter 81 of the Acts of 1919 limited such purchaser's right to one-half of the royalty and one-half of the rental as compensation for damages to the surface, the remaining one-half of the royalty and rentals to be paid to the State. In striking down such act as in violation of Section 51, Article 3, Section 53, Article 3, and section 4 of Article 7 of the Constitution, the Supreme Court used the following language, which language we believe to be decisive of the question at hand:

"As construed by the Supreme Court, this law authorizes the oil and gas to be sold, retaining to the state as a minimum 1/16 of all gas and minerals as roylaty and 10 cents per acre per annum and one-half of all amounts received by the owner over and above the foregoing amounts. The law fixed the rights of the state, as well as the rights of the purchaser. Since the inception of this act, all purchasers of lands from the state, under the provisions thereof, agreed to pay the state, over and above 1/16 royalty and 10 cents per acre, one-half of all other sums received for the gas and oil. Besides, the provisions of the act made the purchaser of land the agent of the state to secure a purchaser, and fixed his compensation definitely therefor. What does the Legislature undertake to do under certain provisions of Senate Bill 310? It expressly undertakes to relieve the purchaser from the payment of any sum over and above the 1/16 royalty and the 10 cents per acre. This is a plain violation of Section 51, Article 3, of the Constitution quoted above. The relinquishment Act constituted the buyer the agent of the State in making mineral leases and fixed his compensation and under the provisions of that act he was to receive for his services one-half of all sums over and above the royalty and 10 cents per acre rental. The provisions of Senate Bill 310 undertake

to take from the state all of the bonus
and give it to the agent whose rights were
fixed in the Relinquishment Act enacted in
1919. This is in clear violation of section
53, article 3, of the Constitution above quoted.

"Again, the Legislature in Senate Bill 310
undertakes to grant relief to purchasers of oil
and gas sold by the state under the provisions
of the Relinquishment Act, and this is plainly
contrary to the provisions of Section 4, Article
7 of the Constitution of this state.

"As shown by this record, the services of
Tippett as an agent for the state had been
rendered, his compensation fixed, and the Empire
Gas & Fuel Company and Tippett owe the state
one-half of all sums received above the roylaty
and 10 cents per acre rental. These rights and
obligations of the parties were definitely fixed
by law. For the Legislature to undentake to change
the conditions fixed by law by releasing or extin-
guishing the debt owing by Tippett and the
Empire Gas & Fuel Company to the state, by re-
lieving them or either of them of their obliga-
tions, or any part thereof, to the state, or grant-
ing them or either of them any relief as purchasers
of the mineral rights, in so far as Senate Bill 310
undertakes to do this, it is clearly repugnant to
the provisions of the Constitution, and is therefore
void."

The above quoted language of the Supreme Court is
directly applicable to the question we are now considering.
As the Acts of 1918 fixed the obligations of purchasers
from the State with respect to the payment of royalty and
rentals, so did Chapter 83 of the Acts of 1917 fix such
obligations with respect to permits and leases issued to
purchasers under chapter 83. What does the Legislature
undertake to do by enactment of Chapter 6 of the Acts of
1921 and Chapter 71 of the Acts of 1925, if such acts are
construed as they have been by former Land Commissioners?
It undertakes to relieve purchasers under Chapter 83
from the payment of the $2.00 per acre cash payment at the
time of the issuance of the lease and the $2.00 per acre
annual payments during the life of the lease. The obliga-
tions as well as the rights of the permittee and the
State were definitely fixed by Chapter 83. The attempted
release and extinguishment of the $2.00 per acre obligations

owed to the State, and the attempted grant of such lease
by the State to the permittee without the payment of the
amounts prescribed by Chapter 83, in our opinion, consti-
tutes a plain violation of Section 51, Article 3, Section
53, Article 3, and S ction 12 and 15 of Article 7 of the
State Constitution. Accordingly, it is our opinion, and
you are advised that Section 4 of Chapter 6, Acts of 1921,
and Section 14, Chapter 71, of the Acts of. 1925, and
Chapter 143, Acts 1925, insofar as said Acts may be con-
strued to repeal and abolish the requirements of the $2.00
per acre cash payment upon the issuance of. the lease and
the $2.00 per acre annual payment thereafter during the life
of the lease, are invalid and unconstitutional.

If said Acts are construed otherwise than as re-
leasing and abolishing the requirments for the two $2.00
per acre payments, it, of course, follows that the require-
ments made by Section 7, Chapter 83, of the Acts of 1917,
for such payments have remained and are now in full force
and effect, unaffected and unrepealed by any subsequent
legislation. In such event, said amounts, if they have
not heretofore been paid, are now existing and unpaid
obligations due to the State by all lessees whose permits
and leases were issued under Chapter 83. We believe this
statement, when considered in the light of the remainder
of this opinion, constitutes a sufficient answer to all
of the questions propounded in your letter.

In conclusion, we will state that we have given
careful consideration to the case of Rhoads Drilling Co.
vs. Allred, 70 S. W. (2d) 576, as well as to the other
decisions cited in that opinion. We believe that the
facts and holding in Rhoads Drilling Company v. Allred, and
the other cases therein cited, are clearly distinguishable
from the facts and conclusions expressed in this opinion. In
the Rhoads case the decision as to the constitutionality
of the statute there attacked was expressly based upon a
finding that an adequate consideration paid by the lessee
there involved supported and rendered valid the reduction
in the royalty obligation granted to the lessee. The
consideration for the reduction of such royalty obligation
is set forth on pages 584, 585, and 586 of. the opinion.

This distinction is clearly pointed out in the
opinion of the Rhoads Drilling Co. case on page 583 where
the Court says:

"The act would be within the constitutional
prohibition if it undertook to authorize the

gratuitous releasing in whole or in part of an existing indebtedness, liability, or obligation to the State. Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419, 420; Judkins v. Robison, 109 Tex. 6, 160 S. W. 955; Greene v. Robison, 117 Tex. 516, 8 S. W. (2d) 655; Empire Gas & Fuel Co, v. State, 121 Tex. 138, 47 S. W. (2d) 265."

In the Statutes now under consideration, we find nothing which we can construe as a consideration required to be paid by the permittees or lessees in return for the attempted release and extinguishment of the permittee's and lessee's obligation to pay the $2.00 per acre case and annual payments required by Chapter 83. Nor are we, informed of any consideration actually paid to the State for such attempted release. In brief, the State has not received any consideration for the attempted release and extinguishment, nor do the statutes condition such release and extinguishment upon a receipt by the State of a consideration.

In opposing the conclusion of this opinion, it will possibly be contended by lessees who are affected by this opinion, that they for several years have held their leases in reliance upon the construction which has heretofore been given by commissioners to the Acts in question. In reply to any such possible contention, we will now state some of the factual history in connection with oil and gas leases covering tens of thousands of acres of University land which leases were issued by virtue of Chapter 83. We are informed that such lessees in many instances have for many years retained their leases by the drilling of a single well on an isolated section of a lease, and in many instances the particular section upon which a well was drilled is situated in a county far removed from the location of other sections of land covered by such lease. Furthermore, these leases have been secured and held without the payment by the lessees of the original $2.00 per acre cash at the time of the issuance of the lease as provided in Chapter 83 and without the payment of a single $2.00 per acre annual payment. The mere statement of the actual conditions which exist with regard to University lands upon which permits and leases have been issued under Chapter 83 serves, we believe, as an effective answer to a contention that the position we take in this opinion is lacking in equity.

This opinion has been extended to some length because of the importance of the questions involved. We

Mr. T. E. Allday, page 24 (O-730)

trust that a full answer has been given to your questions.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By /s/ Robert E. Kepke

Robert E. Kepke
Assistant

REK:BT:br

APPROVED AUG 31, 1939

/s/ Gerald C. Mann

ATTORNEY GENERAL OF TEXAS